# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**KIMBERLY GILIO,**
**as legal guardian on behalf of**
**J.G., a minor,**

       **Plaintiff,**

**v.**                                                    **Case No.: 8:12-CV-955-T-27EAJ**

**SCHOOL BOARD OF**
**HILLSBOROUGH COUNTY,**
**FLORIDA,**

       **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Before the Court are Plaintiff Kimberly Gilio's ("Plaintiff's) **Motion for Preliminary Injunction and Memorandum of Law in Support Thereof** (Dkt. 9), Defendant School Board of Hillsborough County, Florida's ("School Board's") **Response in Opposition to Plaintiff's Motion for Preliminary Injunction** (Dkt. 19), and Plaintiff's **Reply Brief in Support of Plaintiff's Motion for Preliminary Injunction** (Dkt. 31).[1]  Oral argument was heard on the motion.[2]  Upon review of the submissions of the parties and legal arguments, it is recommended that Plaintiff's motion for preliminary injunction be granted in part and denied in part as set forth below.

On May 1, 2012, Plaintiff filed this lawsuit against the School Board alleging violations[3]

_____

[1] The motion was referred to the undersigned for a report and recommendation. (Dkt. 35)

[2] Neither party offered evidence at the hearing but relied on the submissions already filed.

[3] The complaint includes six causes of action:
(1) Violation of the Free Speech Clause of the First Amendment;
(2) Violation of the Free Exercise Clause of the First Amendment;

under the U.S. Constitution and Florida's Religious Freedom Restoration Act, Fla. Stat. § 761.01, et seq.  Thereafter, Plaintiff filed a motion for a preliminary injunction seeking to enjoin the School Board from barring J.G.'s distribution of religious invitations during non-instructional time at school and from enforcing provisions in Board Policy 9700 and Board Policy 5722 that prohibit literature containing certain religious subject matter. (Dkt. 9 at 1)

This case calls upon the Court to reconcile an elementary student's First Amendment rights with the School Board's interest in maintaining the educational environment for the benefit of all students.   Because Plaintiff has established a substantial likelihood of prevailing on the merits of at least some of her claims and has met the other requirements for preliminary injunctive relief, it is recommended that the motion for preliminary injunction be granted in part.

### **Findings of Fact**

1. At the time of the incident leading to this lawsuit, J.G. was a fourth-grade student at Roland H. Lewis Elementary School ("Lewis Elementary"), a public school in Temple Terrace, Florida.

2. Temple Terrace is located in Hillsborough County, and the School Board oversees all public schools in Hillsborough County.

3. The School Board has enacted two Board Policies, among others, governing the distribution of literature from outside organizations (Board Policy 9700)[4] and the regulation of school-sponsored

---

(3) Violation of the Due Process Clause of the Fourteenth Amendment;
(4) Violation of the Establishment Clause of the First Amendment;
(5) Violation of the Equal Protection Clause of the Fourteenth Amendment; and
(6) Violation of Florida's Religious Restoration Act of 1998, Fla. Stat. § 761.01, et seq.
(Dkt. 1)

[4] Board Policy 9700, entitled "Relations with Special Interest Groups," states, in relevant part:

2

publications and productions (Board Policy 5722).[5]

4. Students at Lewis Elementary are permitted to distribute birthday party invitations in the classroom provided that the invitations are appropriate for school and each student in the class receives an invitation.[6]

5. In March 2012, Plaintiff, who is J.G.'s mother and legal guardian, and other members of her

---

No outside organization or staff member or student representing an outside organization may distribute or post literature on that organization's behalf on District property either during or after school hours without the permission and prior review of the Superintendent.

The Superintendent shall establish administrative procedures which require that
    1. criteria established in Policy 5722 - Student Publications and Productions - are used to make a decision regarding materials that students seek to post or distribute.
    . . .
    4. flyers and notices from outside organizations may be made available for parent review in the community resource notebook that is maintained in the school building's office, or distributed to students under the following circumstances:
    . . .
        b. When the event or activity is sponsored by a religious institution/organization, the flyer may not contain a proselytizing message (i.e., promote the benefits of the specific religion).

[5] Board Policy 5722, entitled "School-Sponsored Publications and Productions" states, in relevant part:

The Board reserves the right to designate and prohibit the publications or productions [sic] of any material which is deemed inappropriate. Such materials include those which:
    . . .
    C. Seek to establish the supremacy of a particular religious denomination, sect, or point of view over any other religious denomination, sect, or point of view[.]

[6] The facts in finding 4, as well as findings 12, 13, and 14, infra, are drawn from the Principal's affidavit (Dkt. 20). Affidavit of Kristin Tonelli, June 22, 2012 [hereinafter "Principal's affidavit"].

church organized an Easter egg hunt for children to take place on April 7, 2012 in Raintree Manor

in Temple Terrace, Florida.

6. Plaintiff made invitations to the event that read:

> Join us for an Easter egg hunt!
> What: Easter Egg Hunt
> Date: April 7th
> Time: 2:00 pm
> Location: Raintree Manor
> Why: To have fun and learn the true meaning of Easter.
> Bring: Your Easter basket and wear play clothes – parents are welcome to join us.

(Dkt. 9 Ex. 2)

7. The invitation also included Plaintiff's telephone number and email address.

8. On March 26, 2012, J.G. took twenty (20) of the invitations to school with him to distribute to

classmates during non-instructional time.

9. Before class started, J.G. gave one invitation to a friend. The distribution of this invitation did not

cause any disturbance at Lewis Elementary. The friend's parent later called to RSVP for the Easter

egg hunt.

10. J.G. then asked the substitute teacher who was in charge of his class that day for permission to

distribute the remaining nineteen (19) invitations to his classmates.

11. The substitute teacher told J.G. that she would have to ask the Principal for permission. The

substitute teacher submitted the invitations to the Principal for review.

12. Later that day, the substitute teacher returned the invitations to J.G. with a note from the

Principal  indicating that the invitations could not be distributed.

13. The Principal's note stated: "We are not allowed to pass out fliers related to religious events or

activities. Thank you for your understanding."

4

14. The Principal concluded, as stated in her affidavit filed in this case, that the invitations did not comply with Board Policy 9700 because they "were not age appropriate and contained a proselytizing message."

15. J.G. was not disciplined for handing out one invitation before seeking permission to distribute the remainder.

16. J.G. did not attempt to distribute the invitations outside the classroom after receiving them back from the Principal.[7]

17. J.G. is now in the fifth grade at Lewis Elementary, and as his church continues to hold events and activities for children, J.G. desires to share this information with his classmates through invitations and other literature distribution.

### **Standard of Review**

To obtain a preliminary injunction, a plaintiff must establish (1) likelihood of success on the merits; (2) irreparable harm; (3) that the balance of equities tip in his favor; and (4) that an injunction is in the public interest.  Complete Angler, LLC v. Clearwater, 607 F. Supp. 2d 1326, 1330 (M.D. Fla. 2009) (citing Winter v. NRDC, Inc., 555 U.S. 7 (2008)).  Given their "extraordinary and drastic" nature, preliminary injunctions may be granted only where the plaintiff clearly satisfies the burden of persuasion as to each of these requirements. Id. (citation omitted).  Failure to establish any one of the four factors is fatal. Am. Civil Liberties Union of Fla., Inc., v. Miami-Dade Cnty Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) (citations omitted).

---

[7] The School Board proffered the facts in findings 15 and 16 in its brief filed in opposition to Plaintiff's motion (Dkt. 19 at 5) and during the August 22, 2012 hearing on the motion for a preliminary injunction.  There is no indication that they are disputed by Plaintiff.

**Conclusions of Law**

In seeking a preliminary injunction, Plaintiff contends that Board Policies 9700 and 5722 are unconstitutional, among other reasons, for: (1) restricting student speech in violation of Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); and (2) impermissibly discriminating on the basis of content and viewpoint.

**I. Likelihood of success on the merits**

As a starting point, the parties fundamentally disagree on the nature of the speech at issue. Plaintiff contends that J.G.'s invitations constitute purely personal speech that is subject to regulation under the restrictive standard created in Tinker.  In contrast, the School Board asserts that J.G.'s invitations are subject to regulation under the more lenient standard for school-sponsored speech set forth in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988), or alternatively, under a nonpublic forum analysis.

In Tinker, a junior high school student and two high school students sued under the First Amendment after they were suspended from school for wearing black armbands in protest of the Vietnam War.  Tinker, 393 U.S. at 504. School principals had learned about the planned protest – which involved the community at large – and implemented a policy prohibiting the wearing of black armbands as a result.  Id.  The students were suspended in mid-December until they came back without the armbands.  Id.  They did not return until after New Year's Day, when the planned period for the protest ended. Id.

In finding the school policy unconstitutional, the Supreme Court declared that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id. at 506.  Yet the Court recognized that  school officials need to "prescribe and control conduct

in the schools." Id. at 507.  In balancing these interests, the Court created a rigorous standard that allows a public school to prohibit personal student speech[8] only to prevent a "material and substantial interference with schoolwork or discipline." Id. at 511.

In Hazelwood, high school students claimed their First Amendment rights were violated when their principal prohibited them from publishing articles in the school newspaper about teenage pregnancy and the impact of divorce on families.  Hazelwood, 484 U.S. at 262-63.  In particular, the principal vetoed the pregnancy article because he was concerned that the topic was inappropriate and that the pregnant students, while given false names, would still be identifiable.  Id. at 263.  In upholding the principal's conduct as constitutional, the Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored"[9] activities.  Id. at 273.

In distinguishing Hazelwood from Tinker, the Court noted that the students protesting Vietnam were expressing their individual views and were not using a school-sponsored entity to do so.  Id. at 270-71.  In contrast, the student newspaper in Hazelwood was part of a journalism class in the school's curriculum.  As the Court explained: "The question whether the First Amendment requires a school to tolerate particular student speech . . . is different from the question whether the

---

[8] The Supreme Court subsequently described the student speech in Tinker as "individual expression of personal conscience." Westside Cmty. Schs. v. Mergens, 496 U.S. 266, 287 (1990). Additionally, the Eleventh Circuit explained that personal student expression, or "pure student expression," is student "expression that merely happens to occur on the school premises." Bannon v. Sch. Dist. Of Palm Beach Cnty., 387 F.3d 1208, 1213 (11th Cir. 2004) (per curiam) (citation omitted).

[9] The Bannon court elaborated that school-sponsored speech is an "intermediate" category between the "spectrum of pure student expression and government expression." Bannon, 387 F.3d at 1213.

First Amendment requires a school affirmatively to promote particular student speech." Id.   The Court held that the school's regulation of school-sponsored speech was constitutional if "reasonably related to legitimate pedagogical concerns." Id. at 273.   The Court concluded that the requirement was met in Hazelwood because the principal's refusal to publish the articles was reasonably related to concerns about student privacy and the inappropriateness of the subject matter. Id. at 274-75.

In arguing for the Tinker standard, Plaintiff asserts J.G.'s invitations are personal religious speech that, "far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." Capital Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) (citations omitted).   Plaintiff points to four district court opinions that applied the Tinker standard under similar circumstances in the school setting.   In Johnston-Loehner v. O'Brien, an elementary school prohibited a student from distributing invitations to a church party billed as an alternative to Halloween trick-or-treating.   Johnston-Loehner, 859 F. Supp. 575, 577 (M.D. Fla. 1994).   Finding that the invitations would not have caused a material and substantial interference, the court concluded that the principal's refusal to allow the child to invite her classmates to the party violated the student's First Amendment rights under Tinker.[10] Id. at 581.   Three more recent cases from district courts in Pennsylvania, Arkansas, and Michigan also applied Tinker and held that school districts violated students' First Amendment rights when the students were prevented from handing out invitations to events sponsored by religious organizations.[11]

---

[10] Ultimately, the court permanently enjoined the Polk County School District policy requiring students to submit literature for approval before distributing it on school property. Johnston-Loehner, 859 F. Supp. at 582.

[11] K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., No. 3:11-CV-417, 2011 WL 5008358, at *5 (M.D. Pa. Oct. 20, 2011) (holding that it was unconstitutional under Tinker to bar elementary

In advocating for the <u>Hazelwood</u> standard, the School Board asserts that J.G.'s invitations are literature from his church, an outside organization, and thus, Board Policy 9700 governs their distribution.  The materials acquire the imprimatur of the school and become a curricular activity when they are submitted for review, approved, and then distributed in the classroom.  Once the invitations become school-sponsored speech, the School Board contends that its regulation of J.G.'s speech is reasonably related to the pedagogical purposes of  maintaining the educational environment and avoiding subjecting children to unsolicited religious messages.

On this threshold issue, Plaintiff's arguments should prevail based on the present landscape of First Amendment jurisprudence in the school setting.  Simply put,  J.G.'s invitations cannot be categorized as school-sponsored speech because they are not connected to any curricular activity. In <u>Hazelwood</u>, the Supreme Court described school-sponsored speech as both bearing the imprimatur of the school and arising in the context of a curricular activity. <u>Hazelwood</u>, 484 U.S. at 271.  A curricular activity is one that is supervised by faculty and designed to impart particular knowledge or skills. <u>Id.</u>

The Eleventh Circuit addressed one example of school-sponsored speech in determining that a high school did not violate the First Amendment by prohibiting religious messages in student-painted murals on school grounds.  <u>Bannon</u>, 387 F.3d at 1217.   The court explained that the

---

school student from handing out invitations to a church Christmas party because there was no danger of substantial interference); <u>Wright v. Pulaski Cnty. Special Sch. Dist.</u>,  803 F. Supp. 2d 980, 983 (E.D. Ark. 2011) (under <u>Tinker</u>, school unconstitutionally prevented elementary school student from handing out invitations to a community swim event sponsored by her church); <u>J.S. v. Holly Area Schs.</u>, 749 F. Supp. 2d 614, 623, 630 (E.D. Mich. 2010) (applying the <u>Tinker</u> standard and enjoining school from prohibiting an elementary school student from handing out invitations to a Christian summer camp).

prominent locations of the murals, including near the school's main office, suggested that they had the imprimatur of the school. Id. at 1214.  Additionally, the student expression was a curricular activity because the murals were part of a "beautification project" designed to develop artistic skills and promote school spirit.  Id. at 1215.

In this case, distributing invitations to one's classmates, even during non-instructional time, arguably could be viewed by students' parents and others as bearing the "imprimatur" of the school. But even a generous interpretation of "curricular activity"[12] cannot encompass J.G.s invitation to his classmates to learn the "true meaning of Easter" at an off-site event.  See generally C.E.F. of N.J., Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 526 (3d Cir. 2004) (finding that school's distribution of flyers from outside groups was private, not school-sponsored, speech).  The fact that J.G.'s mother and his church were organizing the Easter egg hunt does not undermine the personal nature of J.G.'s speech.  The School Board conceded at oral argument that J.G. could adopt his church's speech as his own.  The Tinker standard is used when the speech is personal in nature. See generally Searcey v. Harris, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989) (explaining that Tinker applies to "student speech in noncurricular activities") (citation omitted).

Alternatively, the School Board argues that a forum analysis is appropriate because J.G's

---

[12] See Curry v. Hensiner, 513 F.3d 570, 579-80 (6th Cir. 2008) (concluding that school officials could prohibit student from selling candy canes with attached religious cards because the activity was part of a classroom assignment); Walz v. Egg Harbor Twp. Bd. of Educ., 342 F.3d 271, 279, 280-81 (3d Cir. 2003) (finding that an elementary school's holiday parties were "instructional activities," and the school was permitted to bar student from distributing pencils engraved with the message, "Jesus [Loves] The Little Children" during one such party).

elementary school is a nonpublic forum.[13] The government may restrict speech in a nonpublic forum if the regulations "are reasonable in light of the purpose served by the forum and are viewpoint neutral." Bannon, 387 F.3d at 1213 (citation omitted).  In general, schools are considered nonpublic forums unless school officials intentionally opens their doors to the public at large.  See Hazelwood, 484 U.S. at 267 ("school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public'") (citation omitted).  The School Board contends that its restriction on J.G.'s speech is reasonable in light of the young age of J.G.'s classmates and their potential vulnerability to proselytizing messages.

However, the School Board's argument for a forum analysis is not persuasive because that approach typically is employed when an outside group claims it is being treated differently by school officials in gaining access to student events or school facilities that are open to other organizations. See Pocono Mountain Sch. Dist., 2011 WL 5008358, at *3.[14]  Here, where the speaker is a student

---

[13] In a forum-based approach, the government's ability to regulate speech depends on where it takes place.  In a traditional public forum such as a city street, the government may impose reasonable time, place, and manner restrictions on speech, but these are subject to "strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." Pleasant Grove City, Utah, v. Summun, 555 U.S. 460, 469 (2009) (citation omitted). A designated public forum results "if government property that has not traditionally been regarded as a public forum is intentionally opened up" for a designated purpose. Id. at 469 (citation omitted). Government restrictions on speech in a designated public forum are subject strict scrutiny. Id. at 469-70.  A limited public forum is created when the government creates a forum "that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." Id. at 470 (citation omitted).  Restrictions on speech in a limited public forum must be reasonable and viewpoint neutral. Id. (citation omitted).

[14] In any event, as discussed, infra, even under a forum analysis, the School Board's policies cannot withstand scrutiny as they permit viewpoint discrimination.

who is entitled to be on school property, a forum analysis is not relevant.  See generally Rivera v. E. Otero Sch. Dist. R-1, 721 F. Supp. 1189, 1193 (D. Colo. 1989) (rejecting a forum analysis where students challenged school policy prohibiting distribution of Christian newspaper and explaining "it is clear that the students, who of course are required to be in school, have the protection of the First Amendment while they are lawfully in attendance").[15]

Two additional School Board arguments deserve mention, namely that: (1) regulation of J.G.'s speech is acceptable because officials have greater leeway in limiting student expression in elementary schools; and (2) allowing J.G. to distribute his invitations would interfere with the rights of other students to avoid proselytizing messages at school.  Neither of these arguments is persuasive based on the present record, however.

The first issue concerns an unsettled area of law.[16]  For example, in Muller v. Jefferson Lighthouse School,[17] Judge Manion stated that "it is unlikely that Tinker and its progeny apply to

---

[15] See Chad Allred, Guarding the Treasure: Protection of Student Religious Speech in the Classroom, 22 Seattle Univ. L. R. 741, 746-750 (1999) (asserting that a forum analysis is inappropriate for regulating student expression on school grounds).

[16] See Morgan v. Swanson, 659 F.3d 359, 404 (5th Cir. 2011) (en banc) (asserting that "this court has never limited the First Amendment rights of students due to age"); but see Walker-Serrano v. Leonard, 325 F.3d 412, 417-18 (3d Cir. 2003) (surmising that "[e]lementary school officials will undoubtedly be able to regulate much – perhaps most – of the speech that is protected in higher grades").

[17] Contrary to the School Board's interpretation (Dkt. 19 at 12),  Muller did not uphold the school district's actions in prohibiting a fourth-grade student from handing out invitations to a Bible study sponsored by a Christian organization. The district court granted an injunction barring school officials from preventing the student from distributing materials solely because they were religious, and the school district did not appeal that ruling. Muller, 98 F.3d at 1534-35.  The Seventh Circuit observed that the student's "right not to have his expression suppressed solely because it was religious was vindicated in the district court and not appealed here." Id. at 1545.  The appeal dealt with facial challenges to school policies regulating the distribution of materials from outside sources. Id. at 1535.  The Seventh Circuit upheld the policies. Id. at 1545.

public elementary (or preschool) students." Muller, 98 F.3d 1530, 1539 (7th Cir. 1996) (Manion, J.).[18] However, because the Supreme Court had not decided the issue, Judge Manion concluded that the court should err on the side of caution and assume "that grade schoolers partake in certain of the speech rights set out in the Tinker line of cases." Id.

Although the Supreme Court has not squarely defined the First Amendment rights of elementary school students, and student age is an appropriate consideration, the weight of authority in the federal courts of appeal and the district courts supports the position taken by Plaintiff that the Tinker standard applies to J.G.'s Easter egg hunt invitations to his fourth-grade classmates to learn the "true meaning of Easter."

The School Board's concern that permitting J.G. to distribute his invitations would violate other students' rights to be free from religious messages in school[19] erroneously assumes that individuals' First Amendment privileges stop "at the schoolhouse gate." See Tinker, 393 U.S. at 506. A school district cannot prohibit a student's "*private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Mergens, 496 U.S. at 250 (emphasis in original).

Applying the Tinker standard to J.G.'s expression of personal speech, Plaintiff has shown that the School Board's conduct likely violated J.G.'s First Amendment rights because the record is devoid of any evidence that permitting J.G. to distribute his invitations would have caused a

---

[18] Though concurring in the judgment, the three judges reviewing Muller wrote separately; and Judge Eschbach and Judge Diamond Rovner expressly declined to join Judge Manion's view that Tinker may not apply to grammar school students. Muller, 98 F.3d at 1545-46.

[19] Because the record contains only the Principal's note declining J.G.'s request to distribute the invitations and the Principal's affidavit filed with the School Board's response to the preliminary injunction motion, it appears that the School Board regulated J.G.'s speech because it contained a religious message, regardless of the potential effect on other students.

"material and substantial interference with schoolwork or discipline."[20]  Indeed, J.G. gave out one invitation without incident, and the School Board acknowledged at oral argument that if the <u>Tinker</u> standard governs, it cannot prevail against Plaintiff's First Amendment challenge.

Accordingly, Plaintiff has shown a substantial likelihood of success on her claim that the School Board's policies were unconstitutionally applied to J.G.'s speech under <u>Tinker</u>.  However, nothing in this opinion should be taken as suggesting that the Principal acted with ill will or bad motive toward J.G.  Motive is irrelevant to the analysis here.  Nor does it appear that the Principal was doing anything other than following what she perceived to be School Board policy.  But because J.G.'s speech could be prohibited only if it had a material and substantial adverse effect on schoolwork or discipline, and the record contains no such evidence, Plaintiff has shown that the School Board's action violated J.G.'s First Amendment rights.

Plaintiff's as-applied challenge to Board Policies 9700 and 5722 will also be addressed in terms of the scope of any preliminary injunctive relief.

<u>Content and viewpoint discrimination</u>

Plaintiff claims that the challenged provisions in Board Policies 9700 and 5722 were unconstitutionally applied to J.G.'s speech as content-based  and viewpoint-based discrimination. The School Board responds that the policies are viewpoint neutral, and even if they permit content-based discrimination, the policies are reasonable restrictions in the school setting.

---

[20] <u>Compare</u> <u>Heinkel v. Sch. Bd. of Lee Cnty., Fla.</u>, 194 F. App'x 604, 610 (11th Cir. 2006) (unpublished) (per curiam) (citation omitted) (applying <u>Tinker</u> standard and affirming school board's decision denying student permission to distribute "pro-life literature" at middle school where officials reasonably concluded that such materials could cause a "substantial disruption of or material interference with school activities").

Board Policy 9700 bans the distribution of materials from religious institutions or organizations that "contain a proselytizing message (i.e., promote the benefits of the specific religion)." The policy also states that school officials shall use the criteria in Board Policy 5722 to determine whether materials are suitable for distribution at school. In turn, one provision in Board Policy 5722 explains that materials are not appropriate if they "[s]eek to establish the supremacy of a particular religious denomination, sect, or point of view over any other religious denomination, sect, or point of view[.]"

The government engages in content-based discrimination when it limits speech on a general topic. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828-29 (1995). Viewpoint discrimination is a type of content-based regulation that targets a particular stance taken by speakers on a general topic. Id. at 829. Viewpoint discrimination is presumptively unconstitutional.[21] Id. at 828 (citation omitted). But content-based restrictions are permissible in a nonpublic forum if reasonable in light of the forum's purpose and viewpoint neutral. See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 806 (1985) (citation omitted).

Plaintiff argues that the Board Policies constitute viewpoint discrimination because secular groups are free to promote their benefits or to proclaim superiority, while religious organizations cannot do so. While this may be true in theory, there is no evidence in the present record that non-religious groups proselytize or promote the superiority of their views at J.G.'s school. However, by

---

[21] There may be instances in which viewpoint discrimination is permissible. For example, schools could promote student speech discussing the dangers of drug use without being required to permit speech advocating drug use. Bannon, 387 F.3d at 1218-19 (Black, J., concurring) (citation omitted) (asserting that schools may regulate school-sponsored student speech based on viewpoint in certain instances).

banning certain religious messages, it does appear that the Board Policies impermissibly target speech from a religious viewpoint. <u>See generally</u> <u>Rosenberger</u>, 515 U.S. at 831 (concluding that a university policy permitted viewpoint discrimination for denying funding to a publication solely because it discussed subjects from a religious perspective).

As applied to J.G.'s invitations, the contested provisions in Board Policies 9700 and 5722 permit viewpoint discrimination because they target proselytizing messages solely from a religious perspective.   By its own terms, Board Policy 9700 applies only to religious institutions and organizations – not secular groups.  The policy also defines "proselytizing messages" exclusively in relation to religious speech,  or messages that "promote the benefits of the specific religion."  But proselytizing also has a broader meaning, such as "recruit[ing] members for an institution, team, or group." <u>C.E.F. of N.J.</u>, 386 F.3d at 528 (citation omitted).[22]   Likewise, the contested provision of Board Policy 5722 refers strictly to religious speech that "[s]eeks to establish the supremacy of a particular religious denomination, sect or point of view."

Although the School Board asserts that the policies are viewpoint neutral because they apply equally to all religions, regardless of the underlying theology, this argument is not persuasive.[23]

---

[22] Webster's lists the first definition of proselytize as "to convert from one religion, belief, opinion, or party" and the second definition as "to recruit members for an institution, team, or group." <u>Webster's Third New International Dictionary</u> 1821 (3d ed. 1976).

[23] While the School Board also contends that proselytizing speech is treated differently in the context of public schools, this is not a settled area of law. <u>See</u> <u>Hills v. Scottsdale Unified Sch. Dist. No. 48</u>, 329 F.3d 1044, 1053 (9th Cir. 2003) ("[T]he District cannot refuse to distribute literature advertising a program with underlying religious content where it distributes quite similar literature for secular summer camps, but it can refuse to distribute literature that *itself* contains proselytizing language. The difference is subtle but important.") (emphasis in original); <u>but see</u> <u>C.E.F. of N.J.</u>, 386 F.3d at 527 (concluding that a school policy barring proselytizing literature from religious groups was viewpoint-based discrimination).

"That all religions and all uses for religious purposes are treated alike . . . does not answer the critical question whether it discriminates on the basis of viewpoint."   Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 393 (1993).

Therefore, Plaintiff also has shown a likelihood of success on the merits of her claim that the contested provisions of Board Policies 9700 and 5722, as applied to J.G., are unconstitutional viewpoint-based discrimination.

Accordingly, there is no need to reach the facial challenges to Board Policies 9700 and 5722 at this phase of the litigation. See Complete Angler, 607 F. Supp. 2d at 1335 n.13 (citing Renne v. Geary, 501 U.S. 312, 324, (1991) (explaining that it is better to resolve an as-applied challenge to a speech regulation before considering a facial challenge to the regulation)).[24]

## II. Irreparable harm

Turning to the remaining elements of the preliminary injunction test, Plaintiff contends that the loss of First Amendment freedom "for even minimal periods of time constitutes irreparable injury." Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) (citation omitted).  In response, the School Board argues that J.G. has not suffered irreparable harm because he was not prohibited from handing out the invitations "outside of class on his own." (Dkt. 19 at 5) At oral argument, the School Board stated that J.G. could have stood outside his classroom door and handed out the invitations

---

[24] See also Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484–85 (1989) ("It is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily – that is, before it is determined that the statute would be valid as applied."); U.S. v. Booker, 543 U.S. 220, 314 (2005) (Thomas, J., dissenting in part) ("When a litigant claims that a statute is unconstitutional as applied to him, and the statute is in fact unconstitutional as applied, we normally invalidate the statute only as applied to the litigant in question. We do not strike down the statute on its face.").

to each student as he or she entered the room.

However, the Principal's note to J.G. did not suggest that he could hand out the invitations on his own.  And  Board Policy 9700 expressly applies to the distribution of literature from outside groups anywhere "on District property either during or after school hours."  The School Board cannot logically argue that J.G.'s invitations fall under Board Policy 9700 and then assert that J.G.'s rights were not hindered by the policy because he could have ignored it and distributed the invitations without the required prior approval.  Accordingly, Plaintiff has satisfied the second element of the preliminary injunction test.

### III. Balancing of the equities and public interest

In addressing balancing of the equities, Plaintiff submits that the harm suffered by J.G. outweighs any harm to Defendant because a government entity "has no legitimate interest in enforcing an unconstitutional" regulation. <u>KH Outdoor, LLC v. City of Trussville</u>, 458 F.3d 1261, 1272 (11th Cir. 2006).  Furthermore, Plaintiff contends that an injunction would serve the public interest by enforcing J.G.'s constitutional rights.

The School Board counters that lifting Board Policy 9700's restriction on proselytizing literature will lead to a tremendous influx of materials from outside groups.  The Court finds this concern speculative as applied to J.G.  In any event, if the School Board's prediction proves accurate, nothing precludes it from moving to modify or amend a preliminary injunction.

Plaintiff has met the third and fourth elements of the preliminary injunction test and injunctive relief is warranted in this case.  The remaining issue is the scope of that relief.

### IV.  Scope of Preliminary Injunction

The School Board should be enjoined from enforcing the provision of Board Policy 9700 that

prohibits materials containing a "proselytizing message (i.e., promote the benefits of the specific religion)," as applied to J.G.'s religious-themed invitations, unless permitting that expression would cause a  material and substantial interference with schoolwork or discipline.

Additionally, Board Policy 9700 states that criteria in Board Policy 5722 will be used to evaluate materials.  This includes a provision in Board Policy 5722 that directs the School Board to prohibit materials that "[s]eek to establish the supremacy of a particular religious denomination, sect, or point of view over any other religious denomination, sect, or point of view[.]" This provision of Board Policy 5722 also should be enjoined as applied to J.G.'s invitations to religious-themed events, absent a finding that they would cause a  material and substantial interference with schoolwork or discipline.[25]

The preliminary injunctive relief recommended is narrow in scope: prohibiting the School Board from enforcing, as to J.G.'s religious-themed invitations, Board Policy 9700's ban on proselytizing messages and Board Policy 5722's incorporated restriction on materials that seek to establish the supremacy of a particular religious denomination, unless the Tinker standard is met.

While it sets a high bar, the Tinker standard for regulating student expression does not require a school to prove actual disruption or interference in school activities. "Although an 'undifferentiated fear or apprehension of disturbance' is not sufficient to meet [the Tinker] test, schools need not wait until disruption actually occurs in order to prohibit student expression if they reasonably forecast that the expression will cause substantial disruption or material interference with

_____

[25] To be clear, there is no reason to enjoin the School Board's broader application of Board Policy 5722 to J.G., as the policy pertains to school-sponsored publications and productions.  Nor is there any basis to enjoin the School Board from using the additional criteria in Board Policy 5722 to evaluate materials under Board Policy 9700, including rejecting those that "[a]re grossly prejudicial to an ethnic, religious, racial, or other delineated group[,]" or those that "[l]ibel any specific person or persons."

19

school activities." <u>Heinkel</u>, 194 F. App'x at 609 (citations omitted).

Moreover, an immediate order requiring Lewis Elementary to allow J.G.'s distribution of religious-themed invitations is unnecessary.  J.G.'s invitations are not entitled to special treatment.  The School Board must be able to perform its responsibility of educating students, as long as it does so consistent with the Constitution.

### Conclusion

Accordingly,  and upon consideration, it is **RECOMMENDED** that pending final resolution of this action, Plaintiff's Motion for Preliminary Injunction (Dkt. 9) be **GRANTED IN PART AND DENIED IN PART**, in that:

(1)     the School Board **BE ENJOINED** from applying Board Policy 9700's prohibition on proselytizing speech and the incorporated provision of Board Policy 5722 that bans materials seeking to establish the supremacy of a particular religious denomination, sect, or point of view to J.G.'s distribution of invitations to religious-themed events unless such restriction is necessary to prevent a material and substantial interference with schoolwork or discipline;

(2)     Plaintiff's request for an immediate order permitting J.G. to distribute religious invitations and materials during non-instructional time to his friends and classmates at Lewis Elementary and any other relief sought in the preliminary injunction motion **BE DENIED**; and

(3)     Plaintiff's request that the court waive Fed. R. Civ. P. 65(c)'s bond requirement **BE GRANTED**, <u>see</u> <u>Johnston v. Tampa Sports Auth.</u>, No. 8:05-CV-2191-T-27MAP, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006) (explaining that it is appropriate

to waive the bond requirement where a plaintiff's fundamental constitutional rights are at issue).

**Date: October 5, 2012**

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from

attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

Any party objecting to the factual findings in this report and recommendation shall file with the objections a copy of the hearing transcript and provide specific citations to relevant portions of the transcript.